CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
SHANNON COIT (Bar No. 298694)
E-Mail: Shannon_Coit@fd.og
RYAN SHELLEY (Bar. No. 337528)
E-Mail: Ryan_Shelley@fd.org
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-4784
Facsimile: (213) 894-0081

Attorneys for Defendant
MAKSIM ZAITSEV

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MAKSIM ZAITSEV,<br><br>Defendant. | Case No. 2:25-cr-00154-SPG<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS INDICTMENT FOR GOVERNMENT MISCONDUCT; MEMORANDUM OF POINTS AND AUTHORITY; DECLARATION OF COUNSEL**<br><br>**Trial Date:** May 20, 2025<br>**Hearing Date:** May 19, 2025<br>**Hearing Time:** 9:30 a.m. |

Maksim Zaitsev, by and through his counsel of record, Deputy Federal Public Defenders Shannon Coit and Ryan Shelley, hereby move to dismiss the indictment for government misconduct and violations of Mr. Zaitsev's due process rights and the Fifth and Sixth Amendments rights.  In the alternative, the Court should set this matter for an evidentiary hearing.

This Motion is based on the attached Memorandum of Points and Authorities, exhibits, declarations, all files and records in this case, and any additional evidence and argument presented at or before the hearing on this motion.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  May 17, 2025           By  /s/ Shannon Coit

Shannon Coit
Ryan Shelley
Deputy Federal Public Defenders
Attorneys for Maksim Zaitsev

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................. 1

III. ARGUMENT ................................................................................................... 5

    A.    Threatening Mr. Zaitsev Violated His Fifth Amendment Right to Due Process ................................................................................................. 6

    B.    The Government Violated Mr. Zaitsev's Sixth Amendment Rights. .......... 8

    C.    The Court Should Dismiss the Indictment Under its Supervisory Powers. ........................................................................................... 10

        1.    The government's misconduct is flagrant. ................................... 11

        2.    Mr. Zaitsev has been prejudiced by the government's misconduct. .................................................................................. 13

        3.    Nothing less than dismissal with prejudice would sufficiently address and deter the misconduct in this case. ............................. 14

    D.    The Court Should Also Dismiss on Due Process Grounds ........................ 15

IV. CONCLUSION ............................................................................................... 15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*United States v. Aguilar,*
  831 F. Supp. 2d 1180 (C.D. Cal. 2011) ..................................................................10

*United States v. Bernal-Obeso,*
  989 F.2d 331 (9th Cir. 1993) .............................................................................15

*United States v. Bohn,*
  622 F.3d 1129 (9th Cir. 2010) ............................................................................7

*United States v. Bundy,*
  968 F.3d 1019 (9th Cir. 2020) ..............................................................10, 11, 14

*United States v. Chapman,*
  524 F.3d 1073 (9th Cir. 2008) .....................................................................10, 11

*United States v. Greene,*
  454 F.2d 783 (9th Cir. 1971) ............................................................................15

*United States v. Hector,*
  2008 WL 2025069 (C.D. Cal. May 8, 2008) ........................................................13

*United States v. Marshank,*
  777 F. Supp. 1507 (N.D. Cal. 1991) ............................................................1, 5, 8, 10

*McNabb v. United States,*
  318 U.S. 332 (1943) ......................................................................................10

*United States v. Morrison,*
  535 F.2d 223 (3d Cir. 1976) .............................................................................6

*Maine v. Moulton,*
  474 U.S. 159 (1985) .......................................................................................8

*United States v. Nejad,*
  487 F. Supp. 3d 206 (S.D.N.Y. 2020) ...............................................................14

*United States v. Owen,*
  580 F.2d 365 (9th Cir. 1978) .........................................................................8, 14

*Rochin v. California,*
  342 U.S. 165 (1952) ...................................................................................14, 15

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Ross*,
   372 F.3d 1097 (9th Cir. 2004) ............................................................. 10, 13

*United States v. Sabri*,
   973 F. Supp. 134 (W.D.N.Y. 1996) ......................................................... 8, 15

*Soo Park v. Thompson*,
   851 F.3d 910 (9th Cir. 2017) ................................................................. 6, 7

*Washington v. Texas*,
   388 U.S. 14 (1967) ..................................................................................... 5

*United States v. Valenzuela– Bernal*,
   458 U.S. 858 (1982) ................................................................................... 5

*United States v. W.R. Grace*,
   526 F.3d 499 (9th Cir. 2008) ................................................................... 10

*Watts v. State of Indiana*,
   338 U.S. 49 (1949) ..................................................................................... 6

*Webb v. Texas*,
   409 U.S. 95 (1972) ..................................................................................... 5

*Williams v. Woodford*,
   384 F.3d 567 (9th Cir. 2004) ..................................................................... 6

*United States v. Zuno-Arce*,
   25 F.Supp.2d 1087 (C.D. Cal. 1998) ....................................................... 12

**Federal Statutes**

18 U.S.C. § 111 ............................................................................................ 2

**Constitutional Provisions**

U.S. Const. Amend V ............................................................................ 5, 6, 8

U.S. Const. Amend VI ................................................................................ 8

iii

# I. INTRODUCTION

Two months ago, ICE Officers Farris Hisle and Ivan Robles severely beat a handcuffed Maksim Zaitsev inside an ICE office because they did not want him to communicate with his wife.  Six days before trial, following a hearing with this Court, Officer Hisle again menaced and threatened a handcuffed Mr. Zaitsev inside an ICE office because he did not want him to tell the truth to a jury.  It is now undisputed that, after Mr. Zaitsev was returned to ICE custody on Wednesday, Officer Hisle sought him out, pulled down his mask, put his face inches away from Mr. Zaitsev's, and repeatedly said: "remember me."  Now under investigation, Officer Hisle claims that he got in Mr. Zaitsev's face less than a week before trial because he thought it was "interesting" that Mr. Zaitsev did not appear to recognize him.  The real reason is clear, and was clear to Mr. Zaitsev: he wanted to scare Mr. Zaitsev, who remains in ICE custody, to the point where Mr. Zaitsev would never tell the truth.  Officer Hisle obstructed justice at one of the most critical points of a criminal case and has corrupted the truth seeking process beyond repair.  Dismissal is the only remedy in this case, and the Court must dismiss with prejudice the indictment.  *See United States v. Marshank*, 777 F. Supp. 1507, 1520 (N.D. Cal. 1991) (citing authority) ("[D]ismissal of the indictment is appropriate where continuing prejudice from the constitutional violation cannot be remedied by suppression [of evidence].").

# II. FACTUAL BACKGROUND

Mr. Zaitsev is accused of assaulting Officer Robles during an incident that occurred on February 25, 2025.  On that day, Officer Robles was assisting Officer Hisle in arresting Mr. Zaitsev, a Russian national seeking political asylum in the United States.  The incident at issue occurred after Officers Hisle and Robles handcuffed Mr. Zaitsev and led him out into a public hallway outside the lobby to the ICE offices.  Upon realizing he was near his wife, Mr. Zaitsev began to call out to her in Russian and, according to the government, dropped weight.  The sequence of events that followed is disputed.  What is not disputed, however, is that Officer Robles *and* Officer

1

Hisle punched Mr. Zaitsev in the face over and over again, leaving his face and eye battered, bruised, and bloodied. (Ex. A.) Officer Hisle hit Mr. Zaitsev with such force that the plastic glove on his right hand split open. (Decl. ¶ 2.) Mr. Zaitsev was detained and charged with assaulting a federal officer in violation 18 U.S.C. § 111.

On April 2, 2025, this Court granted Mr. Zaitsev bond and ordered his release. (Dkt. No. 13.) Rather than releasing Mr. Zaitsev, the government transferred him to ICE custody pursuant to an immigration detainer on April 4, 2025. (Decl. ¶ 3.) The next day, approximately five officers took Mr. Zaitsev in a small room and interrogated him without counsel present and requested he sign a document in English, a language he cannot speak or read. (Ex. B.) Defense counsel alerted the prosecutors of this incident the day it happened. (*See id.*) In a follow-up meet and confer, prosecutors assured that they would inform immigration officials that such behavior should not be repeated. (Decl. ¶ 4.) Mr. Zaitsev has been in ICE custody ever since, and he will remain in ICE custody even if he prevails at trial. (*Id.*) The case is proceeding to trial on May 20, 2025.

Two days ago, on May 14, 2025, Mr. Zaitsev appeared in front of this Court for a motion hearing in his case. (Dkt. No. 82 at 3.) The hearing focused on, among other things, the admissibility of an excessive force allegation against Officer Hisle. Lead case agent and Federal Protective Services Agent Thomas Smith attended the hearing. Following the hearing, Agent Smith transported Mr. Zaitsev from the First Street Federal Courthouse to the downtown Los Angeles ICE holding facility. (Ex. C.) Officer Hisle was the "receiving [ICE o]fficer" at the facility, though he was not scheduled to be in the intake area. (*Id.*; Decl. ¶ 9.) Agent Smith, knowing Officer Hisle is a witness in this case and previously beat up Mr. Zaitsev, handed Mr. Zaitsev over to Officer Hisle. (Ex. C.) Though Officer Hisle was scheduled to work in the ICE offices that day, his supervisors could not provide any explanation as to why he was in the intake department when Mr. Zaitsev came back to the ICE facility. (Decl. ¶ 9.) When Officer Hisle took control of Mr. Zaitsev, Mr. Zaitsev was in handcuffs, as he

was during their first interaction, and Officer Hisle was wearing a face mask.  (*Id.*; Ex. C.)  Surveillance video produced by the government shows Agent Smith approach the entrance to the ICE office with Mr. Zaitsev in handcuffs.  (Ex. G) Agent Smith speaks through an intercom system with Officer Hisle, who is on the other side of the door inside the ICE officer.  (Ex. D at 05:12-06:11; Ex. G at 05:10-59)  Agent Smith then opens the door for Officer Hisle speaks with him again before handing over custody of a handcuffed Mr. Zaitsev.  (Ex. G at 06:06-25)  Officer Hisle grabs Mr. Zaitsev's arm and brings him into the ICE office.  (Ex. G at 06:23-34)

Inside the office, with his mask on, Officer Hisle asked Mr. Zaitsev "do you remember me?"  (Ex. C.)  When Mr. Zaitsev did not respond, Officer Hisle pulled down his mask and said "Remember me? Remember me?"  (Decl. ¶ 5; *see also* Ex. C ("[W]hile processing ZAITSEV . . . [Officer Hisle] asked ZAITSEV if he remembered him? HISLE stated ZAITSEV looked back and did not recognize HISLE. HISLE stated he then took his face covering off and again asked ZAITSEV, "Now do you remember me?")  The video produced by the government shows that Officer Hisle is within inches of Mr. Zaitsev's face when he says this.  (Ex. D at 06:49-07:10.)  He is also gesturing and moving in a manner that appears that he is forcibly talking to Mr. Zaitsev.  (*Id.* at 07:00-10.)  At one point, he lifts his left arm and points at his own face.  (*Id.* at 07:01-03).  Office Hisle then steps back and walks away, only to come back and get into Mr. Zaitsev's face again.  (*Id.* at 07:09-23.)  In an interview with government counsel and Agent Smith, Officer Hisle claimed that his interaction with Mr. Zaitsev was limited to asking him if he remembered him twice, once with his mask on and once without.  (Ex. C).[1]  Mr. Zaitsev remembers that Officer Hisle said more than this but he could not understand it because he does not speak English.  (Decl. ¶ 11.)  The surveillance video

---

[1] Officer Hisle contradicts his own story in a "Detainee Interaction" memorandum he wrote on May 16.  There, he appears to claim he asked Mr. Zaitsev "if he remembered" him just once before pulling down his mask and walking away.  (*See* Ex. I).  As with his other story, this claim is disproven by the video, which shows him getting in Mr. Zaitsev's face two separate times and speaking at him for much longer than it would take to ask only "do you remember me?"  (Ex. D at 06:49-7:23)

proves Mr. Zaitsev correct.  Officer Hisle initially gets in Mr. Zaitsev's his face and threatens him for 15 seconds before returning and getting in his a second time face for 5 more seconds.  (Ex. D at 06:54-07:09; 07:18-23)  Officer Hisle also appears to be speaking to Mr. Zaitsev both before and in between the two instances where he gets directly in his face.  (Ex. D at 06:49-7:23)  It is not possible that the only thing Officer Hisle said during that time is "do you remember me" twice.  In a memorandum written on May 16, 2025, Officer Hisle claims that he behaved in this manner because he "thought it was interesting" that he and Mr. Zaitsev did not recognize each other.  (Ex. I)  But he did recognize Mr. Zaitsev, and he made certain that Mr. Zaitsev recognized him.

Mr. Zaitsev remembers that another officer interrupted the interaction, saying "man, relax" to Officer Hisle, and Officer Hisle finally backs off.  (Decl. ¶ 6.)  Officer Hisle said what he said and used force as a threat to Mr. Zaitsev, and Mr. Zaitsev took it as one.  Mr. Zaitsev remained quiet and did not respond to Officer Hisle's aggression.  (Ex. D at 06:49-07:57; *see also* Ex. C.)  The surveillance video also captures that after Officer Hisle threatened Mr. Zaitsev, he does not immediately leave.  (Ex. D at 07:23-57.)  He hangs around, seemingly waiting for Mr. Zaitsev, then walks to a back door and holds up a fist, looking back to Mr. Zaitsev as he does so.  (Ex. D at 07:23-57.)

On May 15, 2025, at 9:30 a.m., defense counsel spoke with Mr. Zaitsev by video conference for the first time since the threat.  (Decl. ¶ 5.)  He immediately told her about Officer Hisle's verbal threat and use of force.  (*Id.*)  He was visibly disturbed.  (*Id.*) Following the meeting, at 11:58 a.m., defense counsel emailed counsel for the government about Officer Hisle handling Mr. Zaitsev the previous day and asked the government to confirm Office Hisle did, in fact, do so.  (Ex. E.)  Government counsel responded at 12:20 p.m. stating that it was his "understanding" that Officer Hisle was "one of the officers on duty" and that he would produce a report from Agent Smith "shortly."  (*Id.*)  The government produced a report of the conversation with Officer Hisle three hours later.  (*See* Ex. F (referencing a production that included Exhibit C).)

4

The report contained facts similar to those that Mr. Zaitsev stated, without mentioning the use of physical force.  (*See* Ex. C.)  The report also revealed that Officer Hisle told the prosecutors and Agent Smith about his interaction with Mr. Zaitsev, including his specific actions and statements that were objectively threats given the context, shortly after it occurred.  (*See* Ex. C (stating that the conversation occurred at 12:00 p.m. on May 14, 2025).)  So,. defense counsel was not notified about the threat until a full twenty-four hours later and only *after* defense counsel raised it with the government.  To explain this delay in disclosure, government counsel informed defense counsel that they raised the issue immediately on May 14, 2025 to their supervisors at the United States Attorney's Office ("USAO") as they are required to do.  They were then told not to inform defense counsel right away but instead to wait until the case agent created a report memorializing the conversation.  (Decl. ¶ 8.)  They were told to delay disclosure even though the report added no additional information or investigation into the matter beyond summarizing a meeting that government counsel attended.  (*Id.*)  The USAO did further investigation into the matter on May 15, 2025, and government counsel provided that information to defense counsel at 9:00 p.m. on the same day.  (Ex. H.) This information included that ICE initiated a "disciplinary investigation into the incident to determine whether it is a violation of agency protocol."  (*Id.*)

Officer Hisle was originally listed as a witness in the government's case-in-chief. (Dkt. No. 60.)  However, following this threat, counsel for the government represented that they will no longer call Officer Hisle as a witness, though they will make him available for the defense to call him, as previously requested.  (Decl. ¶ 10.)

### III. ARGUMENT

The government has engaged in outrageous misconduct, violated Mr. Zaitsev's constitutional rights, and obstructed justice.  The truth seeking process of a criminal trial in this case can never recover, and dismissal of the indictment is the only remedy. *Marshank*, 777 F. Supp. at 1520.

5

1  **A.      Threatening Mr. Zaitsev Violated His Fifth Amendment Right to Due**

2  **Process.**

3         The Fifth Amendment's Due Process Clause "guarantees that a criminal

4  defendant will be treated with the fundamental fairness essential to the very concept of

5  justice." *United States v. Valenzuela– Bernal*, 458 U.S. 858, 872 (1982) (internal

6  quotations and citation omitted). At its core, the right to due process is the right to fairly

7  "present a defense." *Webb v. Texas*, 409 U.S. 95, 98 (1972) (per curiam) (quoting

8  *Washington v. Texas*, 388 U.S. 14, 19 (1967)).  The Ninth Circuit has held that such a

9  Fifth Amendment violation arises when, for example, the government "intimidates or

10  harasses the witness to discourage the witness from testifying." *Williams v. Woodford*,

11  384 F.3d 567, 601–02 (9th Cir. 2004) (collecting cases); *Soo Park v. Thompson*, 851

12  F.3d 910, 920 (9th Cir. 2017) (similar).  Said differently, if the conduct "substantially

13  interfere[s] with the defense witness's free and unhampered determination to testify," a

14  due process violation has occurred. *Williams*, 384 F.3d at 602; *see also, e.g.*, *United*

15  *States v. Morrison*, 535 F.2d 223, 228-29 (3d Cir. 1976) (holding improper interference

16  and due process violation when a prosecutor told a defense witness about the dangers of

17  perjury and self-incrimination and about the witness's right not to testify in an

18  intimidating interview).  And these due process principles apply with particular force

19  when law enforcement exploits the "detention of an accused" to achieve its desired

20  result. *See, e.g.*, *Watts v. State of Indiana*, 338 U.S. 49, 54 (1949) ("To turn the

21  detention of an accused into a process of wrenching from him evidence which could not

22  be extorted in open court with all its safeguards, is so grave an abuse of the power of

23  arrest as to offend the procedural standards of due process.").

24         Here, the government's misconduct fundamentally interfered with Mr. Zaitsev's

25  right to be free from harassment and intimidation in defending himself.  Mr. Zaitsev is

26  one of three eye witnesses, and the only non-government witness present during the

27  events charged in a case.  He is uniquely situated to testify to the events of this case

28

*and*, unlike an ordinary defense witness, has a constitutional right to choose to do so as the defendant in this case.

The government's misconduct in this case is analogous to (and far worse than) the conduct in *Soo Park v. Thompson*. 851 F.3d at 920. In *Soo Park*, the Ninth Circuit held that a government agent's statements to a defense witness could "reasonably be interpreted as adequately pleading a deliberate intent on the part of [the detective] to intimidate and otherwise attempt to persuade." *Id.* In that case, a police detective called a defense witness and told her that someone with whom the witness had a "history of violence" would be "really upset" with her testifying. *Id.* (quoting the full threat as "[The witness's former abuser] was really upset about the whole thing because he–he feels like they just made you lose faith in him, I guess.") The Court held that the detective's statement "constitute[d] thinly veiled threats" that the person "might retaliate" against the witness if she testified. *Id.* The Court went on to conclude that it was thus "plausible to infer that [the detective] intended to intimidate [the witness]." *Id.*

That is the same factual situation here. Officer Hisle, who has a history of violently beating Mr. Zaitsev, made a "thinly veiled," if not direct, threat to Mr. Zaitsev by pulling down his mask and saying "Remember me? Remember me?" up close to Mr. Zaitsev's face. It was so objectively aggressive that another ICE officer came over and said "man, relax" to Officer Hisle. (Decl. ¶ 6.) The context in which Officer Hisle made his threats also matters. He did so while Mr. Zaitsev is in ICE custody, showing Mr. Zaitsev that Officer Hisle can get to him whenever he wants. Officer Hisle was also aggressively grabbed Mr. Zaitsev's arm during their interaction. (*Id.* ¶ 5.) The conduct in this case is egregious beyond that in *Soo Park* because the threat came directly from Officer Hisle, rather than the investigating agent (or anyone else); because Mr. Zaitsev is in custody of the agency where Officer Hisle works; and because Mr. Zaitsev is the defendant with a constitutionally protected right to testify, rather than another defense witness.

The government also cannot claim that Mr. Zaitsev's right to unfettered testimony in his own defense is immaterial. *Cf. United States v. Bohn*, 622 F.3d 1129, 1139 (9th Cir. 2010) (holding misconduct would not result in reversal of conviction because intimidated witness's testimony could not have been material). Mr. Zaitsev is the defendant and is one of three witnesses to the key events in this case. And now because of these threats, Mr. Zaitsev is frightened and has been up at night thinking of what might happen to him and where he will be taken. (Decl. ¶ 6.) Specifically, he is worried about his testimony because he does not know what will happen to him if he testifies and whether Officer Hisle will bring him somewhere without cameras again to beat him. (*Id.*) Mr. Zaitsev will remain in ICE custody after trial, so the threat to Mr. Zaitsev's safety will extend well-beyond the end of any testimony he gives.

Because of the egregious misconduct by Officer Hisle, and the other government actors, Mr. Zaitsev's Fifth Amendment due process rights were violated, and the truth seeking process of trial is ruined.

**B.    The Government Violated Mr. Zaitsev's Sixth Amendment Rights.**

The right to counsel is "indispensable to the fair administration of our adversarial system of criminal justice." *Maine v. Moulton*, 474 U.S. 159, 168–69 (1985). The Ninth Circuit has recognized that government misconduct can have a "devastating effect" on a defendant's Sixth Amendment right to counsel. *United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978). If the government's conduct causes prejudice to the defendant, his Sixth Amendment rights have been violated and dismissal is warranted. *Marshank*, 777 F. Supp. at 1525; *United States v. Sabri*, 973 F. Supp. 134, 148 (W.D.N.Y. 1996).

As the Court in *Marshank* explained: "Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. [The Supreme Court has] made clear that,

*at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.*" *Marshank*, 777 F. Supp. at 1525 (emphasis in original) (quoting *Moulton*, 474 U.S. at 170–71).

Here, the government not only failed in its affirmative obligation to preserve Mr. Zaitsev's right to counsel, it affirmatively and intentionally violated that right. The government's lead case agent (and FPS officer), Agent Smith, directly handed over custody of Mr. Zaitsev to Officer Hisle, one of Mr. Zaitsev's two accusers in this case who repeatedly punched him in the face and head just months ago. (Ex. C; Ex. G at 06:06-25.) As lead investigator, Agent Smith is intimately familiar with Mr. Zaitsev's case and Officer Hisle's involvement. Together with government counsel, Agent Smith has met with Officer Hisle multiple times over the last few weeks and months to prepare him to testify against Mr. Zaitsev at trial. (Decl. ¶ 12.) In fact, Agent Smith was bringing Mr. Zaitsev back from a motion hearing they both attended where Officer Hisle's prior excessive force allegation was debated and discussed. After the hand off, Officer Hisle wasted no time before getting in Mr. Zaitsev's face, threatening him, and questioning him, all outside the presence of counsel. (Ex. D at 06:49-7:23.) Government counsel, as well as Agent Smith, learned of this interaction almost immediately after, and met with Officer Hisle to discuss it. (Ex. C.) Inexplicably, the government chose not to notify defense counsel of the clear violation of Mr. Zaitsev's rights right away. Instead, government counsel acknowledged this event for the first time more than a day after meeting with Officer Hisle, and only in response to defense counsel's affirmative outreach about the incident after speaking with Mr. Zaitsev. (Ex. E.) During this delay, Mr. Zaitsev remained in ICE custody after being threatened and harassed with no ability to reach out to counsel on his own. (Decl. ¶ 13.)

This is not the first time the government has violated Mr. Zaitsev's right to counsel during this case. In early April, five officers took Mr. Zaitsev in a small room and interrogated him without counsel present and requested he sign a document in

9

English, a language he cannot speak or read.  (Ex. B.)  Defense counsel alerted the prosecutors of this incident the day it happened.  (*Id.*)  In a follow-up meet and confer, prosecutors assured that they would inform immigration officials that such behavior should not be repeated.  (Decl. ¶ 4.)  But the campaign of harassment against Mr. Zaitsev did not end there.  It only got worse.

This repeated misconduct is clearly prejudicial because it has intimidated Mr. Zaitsev, a criminal defendant with a constitutional right to testify in his own defense, mere days before his trial.  Without the assistance of counsel to protect him from the government's threats, harassment, and interrogation, Mr. Zaitsev was left defenseless. The damage cannot be undone, and the impact of the fear instilled in him by this misconduct cannot be remedied by any relief short of dismissal.  *Marshank*, 777 F. Supp. at 1525 ("[D]ismissal is appropriate [because] there is continuing prejudice from a constitutional violation," and it "cannot be remedied by suppression" of any evidence.).

## C.   The Court Should Dismiss the Indictment Under its Supervisory Powers.

"The court's exercise of its supervisory powers protects the integrity of the federal courts and prevents the courts from 'making . . . themselves accomplices in willful disobedience of law.'" *Bundy*, 968 F.3d at 1030 (quoting *McNabb v. United States*, 318 U.S. 332, 345 (1943)).  A district court has broad discretion to dismiss an indictment on supervisory-powers grounds, including "to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *Chapman*, 524 F.3d at 1085; *see also W.R. Grace*, 526 F.3d at 511 & n.9 (9th Cir. 2008) (clarifying that "[t]here is nothing . . . that limits the inherent powers to these three areas" and barring government from calling any witness not disclosed a year before trial in violation of court order) (cleaned up).

To warrant a dismissal under the Court's supervisory powers, the government's

misconduct must be "flagrant" and cause "substantial prejudice." *See, e.g.*, *Chapman*, 524 F.3d at 1085, 1087; *United States v. Ross*, 372 F.3d 1097, 1110 (9th Cir. 2004). While a single violation can meet this standard, courts must also consider the cumulative effect of the government misconduct on the proceeding. *See Bundy*, 968 F.3d at 1038 (where prosecution team withheld three items of *Brady* material that addressed defense theories but not elements, affirming order dismissing indictment with prejudice based on entire record); *Aguilar*, 831 F.Supp.2d at 1206 (dismissing indictment and stating that "numerous decisions of the Ninth Circuit . . . have reversed convictions because of multiple wrongful acts that, in the aggregate, warranted the exercise of supervisory power") (cleaned up).

Officer Hisle's threat alone warrants dismissal, but it is compounded by the government misconduct surrounding the threat and by the repeat nature of ICE officer's actions. The government's misconduct has been flagrant and caused substantial prejudice, and no remedy short of dismissal will fully address it, achieve deterrence, or vindicate the Court's authority to effectuate the speedy and efficient administration of justice.

### 1.    The government's misconduct is flagrant.

"Although flagrant misconduct cannot be an 'accidental or merely negligent' failure to disclose, the misconduct need not be intentional." *Bundy*, 968 F.3d at 1038 (quoting *Chapman*, 524 F.3d at 1085). "'[R]eckless disregard' is sufficient to give rise to [a finding of] flagrant misconduct." *Bundy*, 968 F.3d at 1038 (quoting *Chapman*, 524 F.3d at 1085).

The government's conduct here was flagrant.  Following a hearing in front of this Court, Agent Smith—the case agent on the case who knows both Officer Hisle and Maksim Zaitsev and that Officer Hisle punched Mr. Zaitsev over and over—handed Mr. Zaitsev, while he was handcuffed with his hands behind his back, to Officer Hisle in the ICE detention facility.  (Decl. ¶ 12; Ex. G at 4:56-9:05.)  In the videos produced by the government, several other officers and uniformed personnel were standing

around the intake area and could have easily been called to assist Agent Smith, but instead he chose to hand of *the defendant* to *another witness* in the case, who had beat him in the face months earlier.  (Ex. D at 06:49-7:23.)

Officer Hisle also did not turn Mr. Zaitsev away.  That is because it appears he intended to be there to receive Mr. Zaitsev.  At the very least, once he was handed Mr. Zaitsev, he wanted to ensure Mr. Zaitsev knew who he was and threaten him.  Mr. Zaitsev states that Officer Hisle aggressively squeezed his arm then got in his face, even pulling down his mask to threatened "Remember me?  Remember me?"  (Decl. ¶ 5.)  The video of the event confirms that Office Hisle got into Mr. Zaitsev's face, not once, but twice.  (Ex. D at 06:49-7:23.)  So, while Officer Hisle tries to claim he was not acting in a threatening manner, the video shows otherwise.  The video also captures that Officer Hisle hangs around, seemingly waiting for Mr. Zaitsev, before walking to a back door, then holding up a fist and looking back to Mr. Zaitsev.  (*Id.* at 07:23-57.)  Mr. Zaitsev is looking in Officer Hisle's direction but even if Mr. Zaitsev did not see him, Officer Hisle's actions indicate his intention to physically and verbally threaten Mr. Zaitsev.

Further, the prosecutors failed to immediately notify defense counsel about this threat to Mr. Zaitsev's safety and violation of his rights.  The government counsel learned about the interaction between Mr. Zaitsev and Officer Hisle at a meeting with Officer Hisle and Agent Smith held around 12:00 p.m. on May 14, 2025.  (*See* Ex. C.)  They told their supervisors at the USAO immediately following the meeting, but were told not to disclose this information to defense counsel right away.  (Decl. ¶ 8.)  The prosecutors were instead instructed by their supervisors to wait until they received a typed report from Agent Smith about the meeting with Officer Hisle—even though Agent Smith was not including any additional information or conducting further investigation for the report—before disclosing.  (*Id.*)  It was not until twenty-four hours later, after noon on May 15, 2025, and only at the prompting of defense counsel, did the line prosecutors acknowledge that such an interaction occurred.  (Ex. E.)  The

12

prosecutors then waited an additional three hours before providing details on the incident, and they produced it in a routine production to defense counsel.  (Ex. F.)  There is no amount of delay that is acceptable when Mr. Zaitsev's safety is at issue and trial is six days away.   *United States v. Zuno-Arce*, 25 F.Supp.2d 1087, 1116 (C.D. Cal. 1998) ("[T]he obligations of the United States Attorney's Office in Los Angeles are institutional and do not depend upon the knowledge of the individual prosecutor who is conducting the trial.").

Lastly, as discussed above, this is not the first time the government has violated Mr. Zaitsev's rights during this case.  Last month, shortly after Mr. Zaitsev was taken into ICE custody, approximately five officers took Mr. Zaitsev in a small room and interrogated him without counsel present.  (Ex. B.)  They requested he sign a legal document he did not understand and could not read.  (*Id.*)  And despite defense counsel notifying the line prosecutors of this incident and their warnings to immigration officials to prevent from such an incident from occurring again, (Decl. ¶ 4), the events at issue here happened.

### 2.    Mr. Zaitsev has been prejudiced by the government's misconduct.

Once flagrancy has been established, "the prejudice standard is low," *United States v. Hector*, No. CR 04-00860-DDP, 2008 WL 2025069, at *18 (C.D. Cal. May 8, 2008), requiring proof only that the flagrant misconduct has had "some [detrimental] impact" on the proceeding, *Ross*, 372 F.3d at 1110.  In this case, that low standard has been satisfied for multiple reasons.

Mr. Zaitsev has not been able to stop thinking about Officer Hisle's threatening actions.  That is because when the trial in this case ends, Mr. Zaitsev will remain in ICE custody.  Officer Hisle, and those he works with, will have access to Mr. Zaitsev long after he testifies.  This reality has kept Mr. Zaitsev up at night.  (Decl. ¶ 6.)  He fears what might happen to him and where he will be taken after his criminal trial is over.  (*Id.* )  Specifically, he is worried about his decision to testify, because he does not know what will happen to him if he does.  (*Id.*)  He fears that Officer Hisle will bring him

13

somewhere without cameras again to beat him.  (*Id.*)  He believes, correctly, that Officer Hisle and other officers have access to him.  This incident also reminds Mr. Zaitsev of his past harassment and violence at the hands of Russian police, which is the basis for his political asylum application.  (*Id.*)  He is now in fear for his life.  (*Id.* ¶ 11)  These legitimate fears have affected his decision and ability to testify in irreversible ways. Mr. Zaitsev has suffered great prejudice warranting dismissal.

> **3.      Nothing less than dismissal with prejudice would sufficiently address and deter the misconduct in this case.**

While it has been "said that dismissal with prejudice requires a district court to find that no lesser remedial action is available . . . in theory, a lesser remedy will always be available." *Bundy*, 968 F.3d at 1043 (everything omitted). What the phrase means "is that any lesser sanction will put the defense at a greater disadvantage than it would have faced had the government [complied with its obligations] in the first place – thereby perpetuating the harm from a violation of a federal constitutional right." *Id.* Dismissal with prejudice may also be warranted based on the "need to impose a sanction that will serve to deter future prosecutions from engaging in the same misconduct." *Id.* at 1044; *see also United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978) ("[D]ismissal is used as a prophylactic tool for discouraging future deliberate governmental impropriety of a similar nature"); *Nejad*, 487 F. Supp. 3d 206 (court performed further factfinding into government's *Brady* violations even after case was dismissed on government motion).

It is hard to escape the conclusion that the government's egregious misconduct stems from a belief that courts will not hold it accountable.  It cannot be that one of the main government witness can threaten the defendant, obstruct justice, and destroy the truth seeking process without consequence. If this case is not dismissed, the message to the government will be that its officers can intimidate defendants out of testifying and wait for hours to tell defense counsel about it.  There are few stronger examples of an extreme case for which such a proportionate response is warranted.

14

**D.  The Court Should Also Dismiss on Due Process Grounds.**

Finally, "due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.'" *Rochin v. California*, 342 U.S. 165, 172-73 (1952) (everything omitted). In considering whether to dismiss an Indictment on Due Process grounds, the court must evaluate "the whole course of the proceedings" in order to determine whether the misconduct violated fundamental "canons of decency and fairness." *Id.* at 169; *United States v. Bernal-Obeso*, 989 F.2d 331, 337 (9th Cir. 1993) ("[S]hould the court uncover egregious wrongdoing by the government [in withholding *Brady* information,] nothing in this opinion forecloses consideration by the court of dismissing the indictment for outrageous government conduct").

The government's conduct here was outrageous and dismissal is therefore warranted to protect Mr. Zaitsev's right to due process.  A government officer, and key witness, directly threatened Mr. Zaitsev, the defendant, verbally and with physical force. Now, Mr. Zaitsev fears for his safety if he testifies.  Officer Hisle obstructed justice, and the damage he has done to this case can never be rectified. A dismissal is warranted on due process grounds based on this outrageous government conduct.

## IV. CONCLUSION

"[D]ismissal of the indictment is appropriate where continuing prejudice from  the constitutional violation cannot be remedied" through other means, such as "suppression of the evidence." *Id.* at 1522, 1525 (dismissing indictment where government misconduct interfered with fair prosecution and attorney-client relationship); *Sabri*, 973 F. Supp. at 148 (similar); *cf. United States v. Greene*, 454 F.2d 783 (9th Cir. 1971) (dismissing indictment based on government misconduct where law

//

//

15

enforcement induced the charged criminal activity by defendant). The Court should dismiss with prejudice the indictment.

In the alternative, the Court should set this matter for an evidentiary hearing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  May 17, 2025          By  */s/ Shannon Coit*
Shannon Coit
Ryan Shelley
Deputy Federal Public Defenders
Attorneys for Maksim Zaitsev